1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  DAVID G. HOLLENBERG (SBN 325408)
   dhollenberg@cpmlegal.com
3  BLAIR V. KITTLE (SBN 336367)
   bkittle@cpmlegal.com
4  CAROLINE YUEN (SBN 354388)
   cyuen@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
   840 Malcolm Road, Suite 200
6  Burlingame, CA 94010
   Telephone: (650) 697-6000
7  Facsimile: (650) 697-0577

8  MOLLY E. ERICKSON (SBN 253198)
   erickson@stamplaw.us
9  **LAW OFFICE OF MOLLY ERICKSON**
   PO Box 2448
10 Monterey, CA 93942-2448
   Telephone: (831) 373-1214

11 *Counsel for Plaintiffs*

12

### UNITED STATES DISTRICT COURT

13

### NORTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15  **KIM SOLANO,** an individual; | Case No. |
| 16  **LUIS SOLANO,** an individual; | **COMPLAINT FOR DAMAGES** |
| 17  **THE HAUTE ENCHILADA, INC.;** | |
|     **HAUTE PROPERTIES, LLC,** | **1. Strict Product Liability** |
| 18 | **2. Inverse Condemnation** |
|     Plaintiffs, | **3. Negligence** |
| 19 | **4. Private Nuisance** |
| 20     v. | **5. Trespass** |
| 21 | **6. Medical Monitoring** |
|     **VISTRA CORPORATION;** | |
| 22  **VISTRA CORPORATE SERVICES COMPANY;** | |
| 23  **DYNEGY OPERATING COMPANY;** | |
|     **MOSS LANDING POWER COMPANY, LLC;** | **DEMAND FOR JURY TRIAL** |
| 24  **MOSS LANDING ENERGY STORAGE 3, LLC;** | |
| 25  **LUMINANT POWER GENERATION INC.;** | |
| 26  **LG ENERGY SOLUTION ARIZONA, INC.;** | |
|     **LG ENERGY SOLUTION VERTECH, INC.,** | |
| 27 | |
| 28     Defendants. | |

**COMPLAINT FOR DAMAGES**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION...................................................................................................1

II.     PARTIES ...............................................................................................................7

        A.    PLAINTIFFS ..............................................................................................7

        B.    DEFENDANTS ...........................................................................................7

        C.    RELEVANT THIRD PARTIES ..................................................................9

III.    JURISDICTION AND VENUE ..........................................................................9

IV.     FACTUAL ALLEGATIONS .............................................................................10

        A.    VISTRA CAPITALIZES ON MOSS LANDING ...................................10

        B.    DEFENDANTS' DESIGN OF THE PHASE I BESS WAS FLAWED ................13

        C.    TWO SMOKE RELATED EVENTS TOOK PLACE BEFORE 2025....................15

        D.    PHASE I WAS FILLED WITH DANGEROUS NMC BATTERIES ....................16

        E.    THE FIRE ON JANUARY 16, 2025 ........................................................19

        F.    DAMAGES TO PLAINTIFFS ..................................................................23

V.      CLAIMS FOR RELIEF .....................................................................................25

              FIRST CLAIM FOR RELIEF
              STRICT PRODUCTS LIABILITY .........................................................25

              SECOND CLAIM FOR RELIEF
              INVERSE CONDEMNATION ................................................................26

              THIRD CLAIM FOR RELIEF
              NEGLIGENCE .......................................................................................27

              FOURTH CLAIM FOR RELIEF
              PRIVATE NUISANCE ...........................................................................29

              FIFTH CLAIM FOR RELIEF
              TRESPASS TO REAL PROPERTY AND CHATTEL ...........................30

VI.     PRAYER FOR RELIEF ......................................................................................31

VII.    DEMAND FOR JURY TRIAL..........................................................................32

## I.    INTRODUCTION

1.    On the afternoon of January 16, 2025, a horrific environmental disaster struck the Central Coast of California, endangering the health and safety of hundreds of thousands of people. Over the course of several hours, a massive fire and thermal runaway event (the "Vistra Fire") engulfed the Phase I battery energy storage building on the grounds of the Moss Landing Power Plant located at 7301 State Highway 1 in Moss Landing, California. The plant, which is the site of the largest battery energy storage system ("BESS") in the world, is comprised of two different energy storage facilities. These facilities are the Vistra Battery Energy Storage Facility ("Vistra BESS"), which is owned and operated by Texas-based Defendant Vistra Corp., and the Elkhorn Battery Facility, which is owned by Pacific Gas & Electric. The fire itself began in and was localized to the Vistra BESS Phase I building ("Phase I").



**The Vistra Fire on January 16, 2025 | Credit: Doug Duran/Bay Area News Group**

2.    The Vistra Fire raged for days, destroying most of the tens of thousands of lithium-ion batteries housed inside the Phase I building. Firefighters were unable to directly engage with the fire due to the associated risks lithium-ion battery fires pose, including the risk of toxic

exposure by smoke inhalation and the potential for explosions to occur using traditional firefighting methods. As a result, the blaze could only be contained to the site itself to prevent the fire from spreading.



**Vistra BESS Site Map | Source: Moss Landing Response**

3.      The Vistra Fire had immediate and dramatic effects on residents. Local officials took emergency precautions just hours after the fire broke out, including closing down Highway 1, the region's main thoroughfare, for three days. Approximately 1,200 residents near the BESS were forced to evacuate from their homes. While the fire burned and thermal runaway consumed the Phase I building, heavy metal-laden toxic smoke and particulates entered the atmosphere and spread for miles across the surrounding area.

4.      After the fire consumed itself, research scientists at San Jose State University's Moss Landing Marine Laboratories ("MLML") studied marsh soils near the BESS and in neighboring areas. The field surveys, which were conducted in a radius approximately two miles away from the Vistra plant, found a dramatic increase in the presence of heavy metals in soil, including nickel, manganese, and cobalt, all of which are materials contained in the lithium-ion batteries used at the Phase I facility. This initial survey confirmed the presence of manganese,

copper, nickel, and cobalt in soil across those sites, at *thousands of times* higher than previous measurements. On January 24, 2025, the California Department of Toxic Substances ("DTSC") conducted a separate screening at sites near the BESS to test for the presence of heavy metals in soil and water. That testing revealed elevated levels of metals in more than one tested area.

5.     Residents of Monterey County and Santa Cruz County have reported a variety of symptoms ranging from sore throats, headaches, respiratory issues such as shortness of breath, and rashes, in relation to lingering toxin exposure from the Vistra Fire. According to the Santa Cruz County Health Department, three people from Santa Cruz County went to the hospital after exhibiting fire-related symptoms, but were ultimately discharged. There have been widespread reports of sickened animals and livestock who were exposed to the toxins.

6.     Chief Joel Mendoza of the North County Fire Protection District of Monterey County publicly stated that Vistra's fire suppression system was insufficient and enabled a chain reaction in which batteries continued to catch fire.

7.     This is not the first time that there has been an incident involving the batteries at the Vistra BESS. On September 4, 2021, just nine months after the facility became operational, the Monterey County Fire Department was deployed in response to a faulty smoke detection system inside the Vistra Facility. After the activation of the sprinkler system, couplings on the flexible hoses of the Vistra Facility's heat suppression system failed, causing water to spray onto the facility's battery racks. The water caused the batteries to short-circuit and generate smoke. Fire crews remained on standby for six days after this incident, and the resulting damage shut down the facility for months. Vistra failed to repair, replace, or update the faulty operational heat suppression system at the storage facility despite actual knowledge that such systems were ineffective based on prior incidents.

8.     Time and time again, the public has been misled about the safety of the Phase I building, and the residents of Moss Landing and surrounding areas are terrified about the impacts of the fire and subsequent fallout.

/././

/././

9.      Plaintiffs Kim and Luis Solano ("Kim and Luis") own and operate The Haute Enchilada Café, Gallery, and Social Club ("the Haute Enchilada") located just over a thousand yards away from the BESS and the Vistra Facility. Following the explosion, they were forced to close their business for two weeks. Following that closure, business at the Haute Enchilada dropped by over 50%, and long scheduled private events were canceled. Kim and Luis have now indefinitely closed the business and are relying instead on private events to attempt to make ends meet.



**The Haute Enchilada Café and Gallery, before the Vistra Fire | Moss Landing, California**

10.      Kim and Luis also own several rental properties that they advertise to the general public on Airbnb, a short-term rental website. Their Airbnb reservations have largely been canceled since the Vistra Fire. The prospect of continuing to rent those properties in the future is slim, as prospective customers determine that Moss Landing is unsafe to visit.

11.      Due to the negligence and carelessness of Vistra and the other Defendants, Plaintiffs face an uncertain and terrifying future. They reside in Moss Landing and made it a point to build their lives and businesses there. Remaining in Moss Landing after this unthinkable disaster could expose them to long-lasting and irreversible health problems. Yet Vistra and the

other Defendants offered nothing other than hopes, prayers, and a $750 gift card to Plaintiffs and their fellow Moss Landing residents. Such a pittance pales in comparison to what Plaintiffs have lost. Vistra and the other Defendants must be held accountable.

12.    On February 18, 2025, Brad Watson, Vistra's Director of Community Affairs, claimed that Vistra learned from the prior incidents at the BESS. He stated, "[t]hose projects were brought down for quite a long time. Once we went in, investigated, and learned what the causes were, in some cases, we had to redesign and reconfigure equipment. And months went by and we lived up to our commitment that we would share all that information on what the root cause was and what we did to correct it, to put the projects back online[.]"[1]



**Side by side images of Feb. 2025 fire and Jan. 2025 fire at Phase I BESS | Source: KGO-TV**

13.    Later in the evening on February 18, 2025, the fire at the BESS ignited once more, emitting more chemicals and toxins into the air around Moss Landing. Vistra insisted that the area is safe. Despite these public statements, Plaintiffs do not feel safe and cannot operate their restaurant any longer, given the disastrous effects of the fire on their business and customers.

14.    On February 21, 2025, Monterey County ordered the disconnection of the Vistra plant from the grid. The County's Board of Supervisors has recommended that no enclosed

---

[1] KSBW-TV, *Who is Vistra? The company in charge of Moss Landing battery storage facility*, https://www.ksbw.com/article/vistra-moss-landing-battery-storage-facility/63458661, last accessed February 26, 2025.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

battery energy storage systems be authorized going forward, due to their dangerousness and this incident.

15.    The residents of the Central Coast and the Moss Landing community have been seriously harmed by the Defendants' callous, careless, reckless, and negligent acts, and bring this complaint to hold them accountable for those acts.



**Aerial view of Vistra BESS on February 11, 2025, with Moss Landing behind. Haute Enchilada indicated in red | Source: CPM**

## II.    **PARTIES**

### A.    **PLAINTIFFS**

16.    Plaintiff **KIM SOLANO** is, and at all relevant times has been, an individual residing in Moss Landing, California. She is an owner and operator of the Haute Enchilada Café, Gallery, and Social Club, also located in Moss Landing, California.

17.    Plaintiff **LUIS SOLANO** is, and at all relevant times has been, an individual residing in Moss Landing, California. He is an owner and operator of the Haute Enchilada Café, Gallery, and Social Club, also located in Moss Landing, California.

18.    Plaintiff **THE HAUTE ENCHILADA, INC.** is a California corporation, headquartered in Moss Landing, California. Plaintiff Kim Solano is its chief executive officer, chief financial officer, director, and secretary. The Haute Enchilada Café, Gallery and Social Club is the fictitious business name of The Haute Enchilada, Inc., and is registered on Monterey County, California's Fictitious Business Names index.

19.    Plaintiff **HAUTE PROPERTIES, LLC** is a California limited liability company, headquartered in Moss Landing, California. Plaintiff Kim Solano is its manager. Haute Properties, LLC is the entity that manages the rental properties owned by Kim and Luis Solano, and located in Moss Landing, California. Haute Properties, LLC pays the required transient occupancy tax to Monterey County that allows it to host and accept short-term renters on platforms like Airbnb.

### B.    **DEFENDANTS**

20.    Defendant **VISTRA CORPORATION** ("Vistra Corp.") is a Delaware corporation, headquartered at 6555 Sierra Drive, Irving, TX 75039. Vistra Corp. is the parent of several Vistra subsidiary Defendants. Vistra Corp. owns the Moss Landing Power Plant, and the Moss Landing BESS.

21.    Defendant **VISTRA CORPORATE SERVICES COMPANY** is a Texas corporation, headquartered at 6555 Sierra Drive, Irving, TX 75039. Vistra Corporate Services Company is a wholly owned subsidiary of Vistra Corp.

22.    Defendant **DYNEGY OPERATING COMPANY** is a Texas corporation, also headquartered at 6555 Sierra Drive, Irving, TX 75039. Dynegy Operating Company is a wholly

1  owned subsidiary of Vistra Corp., and a manager of Defendant Moss Landing Power Company,

2  LLC.

3        23.    Defendant **MOSS LANDING POWER COMPANY, LLC** ("Moss Landing

4  Power") is a Delaware limited liability company with its registered address at 350 N. Paul St.,

5  Dallas, TX 75201. Moss Landing Power is a wholly owned subsidiary of Vistra Corp., and

6  operates the Moss Landing Power Plant as well as the BESS for Vistra Corp.

7        24.    Defendant **MOSS LANDING ENERGY STORAGE 3, LLC** ("Moss Landing

8  3") is a Delaware limited liability company with its registered address at 6555 Sierra Drive,

9  Irving, TX 75039. Moss Landing 3 is also a wholly owned subsidiary of Vistra Corp. Its manager

10  is Luminant Power Generation, Inc. Moss Landing 3 is involved in operating and/or managing the

11  Moss Landing Bess at the Moss Landing Power Plant on behalf of Vistra Corp.

12        25.    Defendant **LUMINANT POWER GENERATION, INC.** ("Luminant") is a

13  Maine corporation headquartered at 54 Keith St., Chelsea, ME 04330. Luminant was formerly

14  called Dynegy Power Generation Inc. Luminant is a wholly owned subsidiary of Vistra Corp., and

15  is a manager of Moss Landing 3.

16        26.    Defendant **LG ENERGY SOLUTION ARIZONA INC.** is a Delaware

17  corporation, with its headquarters at 3800 N Central Ave Ste 460, Phoenix, AZ 85012. LG Energy

18  Solution Arizona Inc. is a wholly owned subsidiary of third-party LG Energy Solution, Ltd.

19        27.    Defendant **LG ENERGY SOLUTION VERTECH INC.**  is a Delaware

20  corporation, with its headquarters at 155 Flanders Road, Westborough, MA 01581. LG Energy

21  Solution Vertech Inc. is a wholly owned subsidiary of third-party LG Energy Solution, Ltd.

22        28.    Defendants Vistra Corp., Vistra Corp. Serv. Co., Dynegy Operating Company,

23  Moss Landing Power, Moss Landing 3, and Luminant shall be referred to herein collectively as

24  the "Vistra Defendants." Defendants LG Energy Solution Arizona Inc., and LG Energy Solution

25  Vertech Inc. shall be referred to herein collectively as the "LG Defendants." At all times

26  mentioned herein, each of the Defendants were and acted as the agents and servants of their co-

27  defendants, and in doing the things hereinafter alleged, were acting in concert with each other,

28  aiding and abetting each other and acting within the course and scope of their authority as such

agents, servants, and employees and with the permission and consent of their codefendants. There may be other individuals, partnerships, corporations or other entities that were responsible for Plaintiffs' damages, and Plaintiffs will amend this Complaint to add further entities.

29.    At all relevant times, each of the Defendants was the agent, servant, employee, coconspirator, alter ego, and/or joint venture of each of the other Defendants. In doing the things herein alleged, each and every Defendant was acting within the course and scope of this agency, employment, conspiracy, alter ego, and or joint venture, and was acting with the consent, permission, and authorization of each of the other Defendants. All actions of each Defendant, as alleged in the causes of action stated herein, were ratified, approved, and/or authorized by every other Defendant with full knowledge of such acts. Defendants are thus jointly and severally liable for those actions.

### C.    RELEVANT THIRD PARTIES

30.    LG Energy Solution, Ltd. ("LG Energy Solution") is a company organized under the laws of the Republic of Korea, or South Korea. In 2020, LG Energy Solution spun off from LG Chem, Ltd., the largest Korean chemical company. On information and belief, LG Energy Solution and LG Chem designed, manufactured, sold, and installed the LG4 NMC lithium-ion batteries used the Vistra Defendants in the Moss Landing BESS Phase I and II projects. LG4 NMC batteries were, and are, LG Energy Solution's flagship energy storage system product.

31.    Pacific Gas & Electric ("PG&E") is a California corporation that provides electrical services to the public, and one of the largest public utilities in the United States. At this time, these relevant third parties are not being named as Defendants, subject to further investigation.

### III.    JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because sufficient diversity of citizenship exists between parties in this action, and the aggregate amount in controversy exceeds $75,000, exclusive of interests and costs.

33.    This Court has personal jurisdiction over all Defendants. Defendants are registered to conduct business in California and do regularly conduct business in California.

34.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because Defendants transact business in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

## IV.    FACTUAL ALLEGATIONS

### A.    VISTRA CAPITALIZES ON MOSS LANDING

35.     Moss Landing has been a fishing village for more than a century and a half. Moss Landing retains its primarily working class nature, remaining a small, tight-knit community. Currently, Moss Landing is home to about 800 people, including Plaintiffs. Two leading marine research institutes are located at Moss Landing due to the remarkable coastal environment that sits at the edge of the largest submarine canyon on North America's west coast. The adjacent northern Monterey County area is primarily rural and agricultural on its rolling hills. Its residents choose to reside there in large part to be in contact with the land and nature, to have access to the outdoors and the quality of the fresh air, and to raise their own food and keep animals that would not be suitable in a more urban environment. Rare and sensitive habitats predominate in the area.



**Aerial view of Moss Landing and Power Plant. Moss Landing Site indicated in red. | Source: U.S. Army Corps of Engineers**

36.     The Elkhorn Slough National Estuarine Research Reserve is a protected wetland area just north of Moss Landing and is environmentally significant to the region. The Reserve supports one of the largest coastal salt marshes in California, and is home to all sorts of wildlife,

including fish, birds, plants, and marine mammals. The Reserve is administered by the National Oceanic and Atmospheric Administration, owned by the California Department of Fish and Wildlife, and supported by the Elkhorn Slough Foundation.

37.     Northern Monterey County and southern Santa Cruz County areas are rural and agricultural. The residents of this area choose to reside there in large part to be in contact with the land, keep animals, grow crops, and otherwise commune with the nature that surround them. Moss Landing is slightly different, due to its presence on the Pacific Ocean and its marine history. Nevertheless, it retains the same character, choosing to remain a small, tight-knit community, as it has been for decades.

38.     The Moss Landing Power Plant, located immediately inland of Moss Landing's business district off Dolan Road at 7301 State Highway 1, has been a towering presence on the Central Coast of California for decades. In 1949, Pacific Gas & Electric began building the plant, which housed several oil and natural gas units by the next decade. The Plant's distinctive 500-foot tall stacks were erected in the 1960s. The Plant eventually became one of the largest in California, producing over 2000 megawatts ("MW") by capacity.

39.     Deregulation led to PG&E's sale of the plant to Duke Energy in 1998. In 2006, Duke sold the plant to LS Power Equity Partners. In 2007, Dynegy Inc. purchased the plant. In 2016, Dynegy took the remaining super steam units offline, lowering the plant's output.

40.     In 2018, Defendant Vistra Corp. merged with Dynegy, in a transaction valued at $1.7 billion, and in doing so acquired the Moss Landing Power Plant. By that year, the plant was operating well below its rated capacity for power generation, and Vistra began to seek new uses for the facility. Its proposed solution was to repurpose the facility for energy storage.

41.     That same year, the Federal Energy Regulatory Commission ("FERC") ordered PG&E to hold competitive solicitations for energy storage solutions. PG&E executed an Energy Storage Resource Adequacy Agreement with Dynegy Marketing and Trade, Inc., which eventually became a Vistra subsidiary following the merger with Dynegy. That agreement called for Vistra to construct Phase I of the BESS, a 300 MW discharge/1,200 MW storage system. Phase I is the portion of the BESS that exploded on January 16, 2025.

42.    In November 2018, Vistra announced that it would start operating the Moss Landing BESS in the fourth quarter of 2020.[2]

43.    To meet the CPUC's deadline for PG&E and Vistra to have a certain amount of battery storage approved, Vistra needed approval for the BESS from Monterey County through a land use entitlement process. During that process, only two groups objected to the Vistra project at the July 29, 2020 Planning Commission hearing. Despite their objections, the Planning Commission held the hearing and approved a mitigated negative declaration under the California Environmental Quality Act ("CEQA") and the associated project file identifier. On information and belief, the Vistra Defendants used their connections and network to solicit the support of local non-profit organizations and community groups with the intent of defeating any County concerns as they related to the BESS' environmental impacts, and with the intent of obtaining the County's approval as soon as possible.

44.    On August 19, 2021, the Vistra Defendants and LG Defendants appeared together at a "Media Day" to celebrate the completion of the Phase II facility at Moss Landing, a 100MW expansion that included outdoor storage of LG batteries.[3] At the event, a Vistra executive stated "LG Energy Solution's innovative battery technology and commitment to this project played an important role in successfully building the Moss Landing Energy Storage Facility." *Id*. And the CEO of Vistra, Curt Morgan, stated "[w]hat's great about [Moss Landing] is that it has the space to support even further expansion – up to 1,500 MW/6,000 MWh – while responsibly utilizing our existing site infrastructure, including existing transmission lines and grid interconnection . . . the Moss Landing Energy Storage Facility stands as a model for how batteries can support intermittent renewables to help create a reliable grid of the future."[4]

---

[2] Luminant, Vistra Energy's Battery Energy Storage Received California Public Utilities Commission Approval, https://www.luminant.com/vistra-energys-battery-energy-storage-contract-receives-california-public-utilities-commission-approval/, last accessed Feb. 26, 2025.
[3] LG Energy Solution, Aug. 19, 2021 Press Release, https://www.prnewswire.com/news-releases/lg-energy-solution-and-vistra-corp-celebrate-the-installation-of-the-worlds-largest-battery-energy-storage-system-at-moss-landing-media-day-event-301358748.html.
[4] Vistra Corp., *Vistra Completes Expansion of Battery Energy Storage System at its Flagship California Facility*, https://investor.vistracorp.com/2021-08-19-Vistra-Completes-Expansion-of-Battery-Energy-Storage-System-at-its-Flagship-California-Facility#assets_43_196-3:10.

B.     **DEFENDANTS' DESIGN OF THE PHASE I BESS WAS FLAWED**

45.     In the rush to construct Phase I, Defendants (including the Vistra Defendants and the LG Defendants) made several critical decisions in designing and conceiving the project that led to the Vistra Fire.

46.     The Vistra Defendants' proposal included using an existing building at the Moss Landing Power Plant, constructed in the 1950s, that originally housed turbines for the power plant. The turbine building was, like many buildings constructed in that time, made of concrete exterior. In that time period, it was common for concrete enclosures to contain asbestos.

47.     Together, the Vistra Defendants and LG Defendants drew up plans to repurpose the old turbine building for Phase I, designing and conceiving of the project together. The specified plans and agreement to produce a certain amount of battery storage was a key consideration in filling the building with as many lithium-ion batteries as possible.

48.     The Vistra Defendants engaged and contracted with the LG Defendants to provide batteries for the Phase I BESS. The chosen batteries were model number JH4. LG's lithium-ion batteries were of the nickel-manganese-cobalt ("NMC") variety and traditionally used for vehicles. The Vistra Defendants also contracted with the LG Defendants to place the batteries on racks manufactured by the LG Defendants.

49.     Despite the energy storage industry's move to lithium-ion phosphate technology for battery storage around the same time, Vistra was in a rush to get approval from all stakeholders for the facility, including PG&E and the California Public Utilities Commission ("CPUC"). During that time, Vistra rapidly threw a plan together, with little public input, and without adequately factoring safety in mind, in order to meet CPUC's deadline.

50.     The turbine building measured 96,411 square feet and was completely enclosed. The battery modules were stored in approximately 9-foot-tall racks. Each 100 MW array consisted of 32-33 cores, made up of 47-48 racks, each containing 22 modules. In total, the Phase I building held nearly 100,000 battery modules. The LG Defendants also designed, manufactured, marketed, and provided the Vistra Defendants with the transportable racks that held the battery modules, model TR1300.

51.     On information and belief, the battery storage method Vistra employed was unsafe, unstable, and prone to creating, in effect, a chemical and heavy metal powderkeg if one or more battery modules were to fail and catch fire. And on information and belief, Vistra and LG knew that the battery storage method was unsafe.

52.     Around the time that Vistra was completing its construction of Phase I, it sought to fireproof the building. One crucial aspect of fireproofing is fire stopping, which refers to the process of filling openings and joints between walls and floors with fire-resistant material, to slow the spread of fire between different compartments within a building,[5] buying individuals and firefighters more time to safely evacuate and respond to the fire, respectively.

53.     The fire stopper reviewed the layout of the turbine building, with its open floor plan and eight-foot-tall walls inside a fifty-foot-tall building and concluded that fire stopping was not a practical use of time, money, or resources. Fire stopping the building would serve no purpose.



**Battery packs inside Phase I of Moss Landing BESS. Credit: LG Energy Solution**

54.     Nevertheless, Vistra pushed forward, and construction continued through 2020. The building went online and connected to PG&E's system and its transmission lines in December 2020.

---

[5] CLM Fireproofing, *What is Firestopping in Construction*, https://clmfireproofing.com/what-is-fire-stopping-in-construction/, last accessed February 26, 2025.

### C.    TWO SMOKE RELATED EVENTS TOOK PLACE BEFORE 2025

55.    Prior to the Vistra Fire, two separate smoke related events took place at the Vistra BESS. The first event occurred at the Phase I Building on September 4, 2021. Per a press release by Vistra, the building's Very Early Smoke Detection Apparatus ("VESDA") malfunctioned, causing water to be injected into the battery modules at the areas where a certain level of smoke was detected. In the press release, Vistra claimed that the VESDA suffered a "programming error," triggering the release of water at "detected smoke levels below" the prescribed level.[6] The subsequent failure of couplings on the battery heat suppression system caused water to be sprayed onto battery racks, causing smoke and battery damage. Seven percent of the batteries inside the Phase I building were damaged by the fire. Vistra was forced to remove Phase I from operation during the investigation.

56.    In January 2022, following the 2021 fire, Vistra committed to the following actions of correction:

   a.    A complete review of the fire suppression system, as well as identifying leaks;

   b.    Installation of an air supervision system to monitor for leaks in the heat suppression system;

   c.    A review of the VESDA system's programming;

   d.    Installation of smoke detectors in all air handling units; and

   e.    Sealing of gaps in the upper floor.

57.    There is no independent proof that Vistra implemented those corrective actions. What is clear is that Vistra did nothing to remove the NMC batteries, instead replacing them with the same model batteries, with the same NMC specifications, manufactured by the LG Defendants that were originally installed on racks provided by LG Defendants, in Phase I. The only modifications made by Vistra were to the fire suppression system and the VESDA.

---

[6] Vistra Corp., Findings and Corrective Actions, Sept. 4, 2021 Incident, *available at* https://cityfire.com/wp-content/uploads/2024/01/Findings-and-Corrective-Actions-Moss-Landing-Phase-I-FINAL.pdf, last accessed February 26, 2025.

58.    Only a month later, on February 13, 2022, a separate facility, Phase II at the BESS, the 100 MW outdoor storage facility also experienced a smoke-related event. Phase II also used the same model JH4 LG batteries in that system. Vistra was forced to take the entire BESS offline for several months to investigate the ongoing issues.

**D.    PHASE I WAS FILLED WITH DANGEROUS NMC BATTERIES**

59.    The Moss Landing BESS Phase I building, as stated above, uses lithium-ion batteries produced by the LG Defendants. Lithium-ion batteries contain volatile reactive electrolytes, that are susceptible to thermal runaway events caused by some kind of trigger, which in turn can lead to fires and toxic emissions, as it did in this case. In particular, the LG Defendants use nickel cobalt manganese oxide ("NMC") batteries, which are more susceptible to thermal runaway events than the comparatively safer lithium Iron Phosphate ("LFP") batteries.[7]

60.    Thermal runaway describes a violent chain reaction where a battery cell has reached a critical temperature at which the temperature will continue to rise on its own. It is a dangerous self-perpetuating state in which the initial rise in temperature triggers further uncontrollable rises in temperature.[8]



**LG JH4 lithium-ion batteries in rack storage | Source: lgessbattery.com**

---

[7] Premnath et al., *Detailed characterization of particle emissions from battery fires* (2022) Aerosol Science and Technology 337, 351; Kaliaperumal et al., *Cause and Mitigation of Lithium-Ion Battery Failure—A Review* (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8510069/, last accessed February 26, 2025.
[8] Science Direct, *Thermal* Runaway, https://www.sciencedirect.com/topics/chemistry/thermal-runaway, last accessed February 26, 2025.

61.     This dangerous chain reaction occurs during battery failure, which can be broadly categorized into four stages.[9] During the first stage, the batteries are subjected to some kind of triggering event, such as overheating, overcharging or physical damage. When the triggering event occurs, liquid electrolytes within the batteries are transformed into a gas. During the second stage of failure, these gases escape from the cell and are susceptible to ignition. At this stage, if appropriate preventative measures are implemented, it is possible to detect the leakage of gases early, allowing time to put a stop to the triggering event, and prevent thermal runaway and its devastating consequences.[10]



**Diagram of lithium ion battery internal structure | Source: Tech4Fresher**

62.     Where early detection and prevention does not occur, gas builds up within the cell until the pressure breaches the separator, a critical safety feature of lithium-ion cells.[11] This marks the third stage of battery failure, which is accompanied by smoke generation. At this stage, thermal runaway is imminent, and where there's smoke, there's often fire. Fire and explosions arise in the fourth stage of battery failure. Though explosions do not always occur, the release of thermal runaway gases into an enclosed space results in an explosion hazard.

---

[9] Premnath et al., at 337-38.
[10] *Id.*
[11] Christopher J. Orendorff, *The Role of Separators in Lithium-Ion Cell Safety* (2012), available at https://www.electrochem.org/dl/interface/sum/sum12/sum12_p061_065.pdf.

63.     Thus, storing batteries in an enclosed space, as all Defendants here planned to do, and did, trapped gas emissions from the thermal runaway event that eventually led to multiple explosions. Alarmingly, once thermal runaway is triggered, the fire and heat from one battery cell then triggers other adjacent cells, leading to potentially widespread propagation of thermal runaway, and more smoke, more fire, and potentially explosions.

64.     Numerous scientific studies have shown that battery fires from thermal runaway events can lead to significant particle and gas emissions. Indeed, tests on both LFP and NMC modules showed particle emissions rates five to six orders of magnitude higher than those typically emitted from heavy-duty diesel engines.[12]  Although the exact composition of emissions from the Moss Landing BESS fires will need to be determined via testing, some gases that are generally produced during lithium-ion thermal runaway events include carbon monoxide ("CO"), carbon dioxide ("CO2"), methane ("CH4"), ethylene ("C2H4"), ethane ("C2H6"), fluoroethane ("C2H5F"), hydrogen (H2), and hydrogen fluoride ("HF").  In addition to these harmful gases, studies of fires resulting from NMC lithium-ion cells show that heavy metals, nickel, cobalt and manganese are released.[13]

65.     A massive explosion and thermal runaway event can cause significant health and environmental concerns. Fine particles can penetrate deep into the lungs, causing respiratory issues. Hydrogen fluoride and other decomposition products resulting from the thermal runaway of NMC batteries are highly toxic and can cause severe health effects. Particulate matter and toxic gases can contaminate air and soil, posing risks to ecosystems.

66.     On information and belief, the Vistra Fire and subsequent thermal runaway expelled all the aforementioned metals and noxious gases into the air over Moss Landing, rising thousands of feet in the air. Those heavy metals that did not fall in the immediate vicinity of the BESS were picked up by wind. The plume precipitated over parts of north Monterey County and south Santa Cruz County, falling on an area covering a twenty mile radius from the BESS. The

---

[12] *See* Premnath *et al.* at 352.
[13] Held *et al.*, *Thermal runaway and fire of electric vehicle lithium-ion battery and contamination of infrastructure facility* (2022) 165 Renewable and Sustainable Energy Reviews 112474, https://www.sciencedirect.com/science/article/pii/S1364032122003793#tbl1.

highest concentrations of particulate matter were located in a critical zone near the BESS, as well as a zone three to seven miles away from the BESS.

### E.    THE FIRE ON JANUARY 16, 2025

67.    On January 16, 2025, at approximately 3:00pm, fire broke out at the Phase I building at the Moss Landing BESS. First responders arrived soon after. By 3:30pm, a Monterey County Department of Emergency Management official had been notified. By 5:35pm, flames were visible on the roof of the Phase I building. The blaze quickly grew in size, sending massive plumes of toxic smoke into the air.

68.    Within minutes, conditions worsened considerably. County officials requested road closures in and around the BESS at 6:04pm. The County's Emergency Operations Center then activated Level 2, which it categorizes as "a significant emergency that may require assistance from outside organizations." At 6:22pm, the County requested that the U.S. Environmental Protection Agency ("EPA") respond to the location. At 6:32pm, the Monterey County Sheriff issued an evacuation order for individuals living in the immediate vicinity of the Power Plant. Over 1,200 individuals complied and evacuated from the Moss Landing/Elkhorn Slough area.



**Phase I on fire, January 16, 2025 | Credit: Monterey County**

69.    First responders were unable to stem the blaze, due to its extreme temperatures and dangerous thermal runaway. The fire had spread beyond control due to the failure of Phase I's fire

suppression systems. The fire began to destroy the building, expelling significant quantities of smoke into the air, including heavy metals from the battery cathodes and the cells themselves. Firefighters could not use traditional firefighting methods to combat the flames due to the high temperatures, and the content of the blaze. Further, the unpredictable nature of lithium-ion battery fires made it difficult for firefighters to know which parts of the building remained extinguished.

70.    As the fire raged, officials were forced to take additional measures to protect the public. By 8:15pm, County officials had opened an evacuation shelter. At 8:30pm, the County announced that local schools would be closed the following day, Friday. At 10:59pm, the County issued a "Health Advisory." The advisory told residents to "follow evacuation orders, that sensitive groups that see or smell smoke can reduce smoke exposure by remaining indoors with windows closed, and that residents with health concerns or symptoms contact their medical provider or seek medical attention." EPA personnel arrived on scene at 2:00am on Friday, January 17.



**January 17, 2025 image of Phase I continuing to emit smoke | Credit: Monterey County**

71.    By noon on January 17, the remaining batteries inside Phase I began combusting. According to Monterey County, the EPA's initial monitoring of hydrogen fluoride gas readings

showed levels below what would be considered harmful. At 6:00pm, the County lifted the

evacuation order, and at 10:00pm the shelter closed.

72.     On January 18, 2025, Monterey County issued another Health Advisory, advising

those that lived close to the fire who smelled smoke to "minimize outdoor activities due to

possible lingering particulate matter and contaminants in the air," and to "consult with a medical

provider" if adverse symptoms developed or worsened.

73.     By January 19, 2025, Monterey County lowered the threat level to a level 3 threat.

The County also requested that the State of California send a Health Assessment Team to the

area. By 5:00pm that day, the closure of Highway 1 was lifted.

74.     On January 20, 2025, the EPA demobilized, and the State authorized a Health

Assessment Team to mobilize to the area. In a press release, the EPA concluded that "results for

hydrogen fluoride and particulate matter showed no risk to public health throughout the incident,

and smoke from the facility has greatly diminished." EPA further claimed that Vistra contracted

with an unidentified third-party environmental group with expertise in air monitoring to conduct

air monitoring.



**Aerial image of Phase I on January 20, 2025 | Credit: Monterey County**

75.     On January 23, 2025, the Monterey County Board of Supervisors declared a state

of emergency during a special session convened to discuss the impact of the fire on the

community, permitting the County to seek state and federal assistance. A video link to that special session is available here: https://www.youtube.com/watch?v=ESrtqvhvgFg.

76.    On January 24, 2025, the California Department of Toxic Substances Control ("DTSC"), in coordination with the Monterey County Environmental Health Bureau ("EHB"), conducted soil screening, collecting soil and surface water samples for analysis.

77.    On January 27, 2025, research scientists at San Jose State University's Moss Landing Marine Laboratories ("MLML") announced that their initial testing of soil in the vicinity of the explosion revealed "unusually high concentrations of heavy-metal nanoparticles in marsh soils at Elkhorn Slough Reserve following the recent fire at the nearby Vistra Power Plant's lithium-ion battery storage facility."[14]

78.    MLML also observed that the higher concentrations were connected to the contents of the cathodes for the lithium-ion batteries used at the Vistra Phase I facility, and that "heavy metals will chemically transform as they move through the environments and potentially through the food web, affecting local aquatic and terrestrial ecosystems[.]"[15] These statements at least contradict, if not call into question, EPA's conclusion that there is no danger to the community based on EPA's air monitoring results.

79.    Community members gathered to take matters into their own hands. Organized by a group called Never Again Moss Landing, volunteers collected 124 surface wipes of outdoor locations across the central coast on the weekend after the fire burned out. Those results were sent to an independent laboratory in Utah for analysis. The testing data was alarming. For example, it revealed concentrations of nickel and cobalt thirty times higher within twenty miles of the BESS than samples collected closer to the plant. The levels are mostly elevated north and east of the facility, which matches plume models generated by a researcher at the University of California, Santa Cruz.

80.    Many of these heavy metals are known carcinogens, or possible carcinogens.

_____

[14] Christian Balderas, Ricardo Tovar, KSBW-TV, *Scientists find heavy metal spike in Moss Landing soil post-battery facility fire*, https://www.ksbw.com/article/heavy-metal-moss-landing-soil-battery-facility-fire/63575941, last accessed February 26, 2025.
[15] *Id.*



**Image showing nickel levels overlaid on NOAA smoke plume model | Credit: Hunterbrook**[16]

81.     On January 31, 2025, Monterey County published the results of the DTSC soil tests. At all testing sites, cobalt levels were elevated. One site exceeded normal levels for nickel, manganese, and copper. Despite this evidence, the County stated that the data was not conclusive.

82.     On February 21, 2025, Monterey County announced that the Vistra facility would be taken offline indefinitely to allow for the disconnection of the remaining lithium-ion batteries that were not consumed by the fires.[17]

**F.     DAMAGES TO PLAINTIFFS**

83.     Since the fire, Plaintiffs' life and livelihood have been significantly damaged. They live and work in Moss Landing, and the impact of the explosion on their community cannot be overstated. Plaintiffs were alarmed to see the flames and smoke from their windows overlooking

---

[16] Hunterbrook, https://hntrbrk.com/vistra-data/, last accessed February 26, 2025; https://www.datawrapper.de/_/Fb9Ic/; see also https://www.datawrapper.de/_/oOt7h.

[17] *See* County of Monterey, *Battery Disconnection Process to Begin at Moss Landing Site to Reduce Risk of Reignition*, https://www.countyofmonterey.gov/Home/Components/News/News/11192/1336?backlist=%2fgovernment%2fdepartments-a-h%2fhealth%2f, last accessed February 26, 2025.

the BESS. Soot and ash deposited from the fire covered most of Moss Landing, including Plaintiffs' home, their restaurant, gallery, and their Airbnb rentals. Plaintiffs and their fellow Moss Landing residents spend much of their daily lives outside, spending time surfing, kayaking, and birding at Elkhorn Slough – all activities that were suddenly interrupted by the pollution and disturbance produced by the Vistra Fire.

84.    Kim and Luis were forced to close the Haute Enchilada because it was located in the mandatory evacuation zone. The coveted outdoor tables at the restaurant were covered in fallout from the explosion. Kim and Luis had to pay their employees out of pocket for the days of work they missed. They also were forced to throw away thousands of dollars' worth of food that they feared had been contaminated by the toxic fumes and metal deposits left by the fire.

85.    When they were able to reopen the Haute Enchilada, Kim and Luis noticed that the restaurant's usual business income had declined by over 50%. People did not feel safe coming to Moss Landing for any reason, let alone eating at a restaurant. Even frequent visitors stayed away.

86.    Customers canceled reservations, as well as private parties that were planned months in advance. The decline in business made it impossible for Kim and Luis to keep the restaurant open, even after reducing operating hours. Kim had to return several deposits.

87.    Kim and Luis also experienced symptoms they believe resulted from the fire and thermal runaway. Despite abiding by the County's recommendations to stay inside, when Kim and Luis evacuated, they inhaled smoke and fumes that came from the BESS. The long-term effects on their health from living near the BESS on January 16, 2025 and inhaling the toxic gases containing heavy metals like nickel, cobalt, manganese, and lithium requires medical monitoring.

88.    On February 21, 2025, Kim and Luis made the difficult decision to close the restaurant indefinitely. For now, the Haute Enchilada will operate only as a gallery and private event space.

89.    Additionally, Kim and Luis' Airbnb rental business through Plaintiff Haute Properties, LLC, has become nearly stagnant. People, including tourists, simply do not feel safe coming to Moss Landing.

90.    Plaintiffs have been damaged by Defendants' tortious conduct, as described above.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**STRICT PRODUCTS LIABILITY**
**AGAINST ALL DEFENDANTS**

91.     Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1-90 as if previously set forth herein.

92.     The lithium-ion batteries designed, manufactured, and sold by the LG Defendants in this case were defectively manufactured, leading to thermal runaway and resulting in the fire at Phase I on January 16, 2025.

93.     The lithium-ion batteries designed and sold by the LG Defendants in this case were defectively designed, leading to thermal runaway and resulting in the fire at Phase I on January 16, 2025.

94.     The lithium-ion batteries designed and sold by the LG Defendants to the Vistra Defendants in this case were distributed without adequate instructions or warnings of the potential for harm for thermal runaway should they overheat, leading to thermal runaway and resulting in the fire at Phase I on January 16, 2025.

95.     The lithium-ion batteries designed and sold by the LG Defendants to the Vistra Defendants in this case were substantially the same at the time of the fire as when they left LG's possession. Furthermore, Plaintiffs are informed and believe that the lithium-ion batteries were used or misused in a way that was foreseeable—they were placed in battery racks designed by the LG Defendants at the Moss Landing BESS facility to store electricity reserves for use during peak hours, per the facility design, which the LG Defendants contributed to. Plaintiffs further are informed and believe that the manufacture and design of the lithium-ion batteries were a substantial factor in causing the initial fire and subsequent harm experienced by Plaintiffs.

96.     The Vistra Defendants collaborated with the LG Defendants in manufacturing and designing the lithium-ion batteries responsible for the Vistra Fire. The Vistra Defendants purchased over 100,000 batteries from the LG Defendants to be installed at the Phase I building, and benefitted from the creation of the project facility, as well as being able to collaborate and direct the manufacturing and design of the facility's batteries.

97.     Vistra Defendants and LG Defendants together designed the defective facility of the Phase I BESS, stacking thousands of pouch-cell battery modules together inside an enclosed building, which led to the fire and thermal runaway that took place on January 16, 2025.

98.     Vistra Defendants failed to adequately warn the general public and legislators about the dangers of a massive NMC lithium-ion battery storage facility contained within an antiquated former power turbine building at Moss Landing Power Plant.

99.     The risk of a catastrophic fire and thermal runaway event was reasonably foreseeable at such a facility. All Defendants were aware of this, given the overheating/smoke event that occurred at Phase I in 2020.

100.     Plaintiffs were injured by the defects in manufacturing and design by Defendants when the batteries ignited and then entered thermal runaway, emitting toxic metals and particulate matter into the air, and did not have warning of the dangers of a BESS inside an enclosed structure.

101.     It was reasonably foreseeable that Plaintiffs and residents of the surrounding areas would be damaged by toxic fallout from a thermal runaway event. The risk of constructing, maintaining, and operating an enclosed BESS did not outweigh the benefits to the community.

102.     Plaintiffs seek damages according to proof at trial, including, but not limited to, loss of income, remediation, substantial interference with the use and enjoyment of their properties, and medical monitoring in the future.

**SECOND CLAIM FOR RELIEF**
**INVERSE CONDEMNATION**
**AGAINST THE VISTRA DEFENDANTS ONLY**

103.     Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1-102 as if previously set forth herein.

104.     On the date of the Vistra Fire, Plaintiffs owned real property near the Moss Landing BESS, Phase I.

105.     The Vistra Defendants designed, constructed, installed, operated, controlled, used, and maintained the battery storage and other electrical equipment within their utility infrastructure, to provide electrical services to customers all over California.

106.    Defendants knew that the battery storage equipment in the Vistra Defendants' utility structure, which the Vistra Defendants designed and constructed was prone to overheating suddenly, could catch fire, and create a cascading effect of fires sufficient to raise the temperature of the batteries enough to produce thermal runaway. The Vistra Defendants knew full well the significant risks and danger of the electrical equipment and battery storage units they had designed and constructed, as well as their need to maintain, keep in orderly fashion, properly design, and choose the proper batteries for such a system.

107.    The inherent risks of that system revealed themselves on January 16, 2025, when the Vistra Fire broke out in the Phase 1 building, which resulted in the taking of Plaintiffs' real property and/or private property.

108.    The taking was legally and substantially caused by the Vistra Defendants' actions and omissions in designing, constructing, installing, operating, controlling, using and/or maintaining the battery storage, facilities, lines, and other electrical equipment within the Vistra Defendants' utility infrastructure.

109.    Plaintiffs have not been adequately compensated by Vistra Defendants for this taking, beyond the pittance of a $750 gift card.

110.    Plaintiffs seek, pursuant to California Code of Civil Procedure section 1036, to recover all reasonable costs, disbursements, and expenses, including reasonable attorneys' fees, appraisal fees, and other fees incurred by filing this proceeding and/or in any appellate court where the Plaintiffs prevail on any issue so raised.

### THIRD CLAIM FOR RELIEF
#### NEGLIGENCE
#### AGAINST ALL DEFENDANTS

111.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1-110 as if previously set forth herein.

112.    Defendants, the operators of a large battery storage facility, have knowledge of the dangers of lithium-ion battery fires. They owed Plaintiffs a non-delegable duty to conduct their operations in a safe manner, including designing the Moss Landing BESS safely, to protect the public, including Plaintiffs from exposure to chemicals.

113.    Defendants also owed a duty to ensure that the BESS was up to date on fire prevention, proper storage and handling of lithium-ion batteries, and harmful emissions caused by the toxic substances contained in those batteries.

114.    Defendants knew or should have known that nickel-cobalt-magnesium lithium-ion batteries are prone to overheating, and when overheating occurs, that can cause the batteries to catch fire and explode, causing thermal runaway and the leeching of hazardous metals into the air via plumes of toxic smoke, depositing those metals into the ground, water, and soil.

115.    Defendants knew or should have known that NMC lithium-ion batteries were more prone to fires than newer, safer lithium-ion battery technologies. Defendants knew or should have known that storing NMC lithium-ion batteries in racks in close proximity to one another, all in an enclosed building, was inherently dangerous and risky.

116.    Defendants breached those duties owed to the Plaintiffs by:

       a.    Failing to design, operate, maintain, and/or repair the Phase I BESS so as to ensure it was operating safely and properly;

       b.    Failing to replace the faulty NMC lithium-ion battery storage system contained inside the Phase I BESS when it was clear that the system was not safe;

       c.    Failing to monitor and mitigate the risks attendant to usage of NMC lithium-ion battery storage in an enclosed, concrete facility;

       d.    Failing to implement adequate safety protocols within the Phase I BESS building to prevent the overheating of the NMC lithium-ion battery modules stored in close proximity to each other, on racks stacked throughout the building;

       e.    Failing to maintain a functional fire suppression system, or repair the system that that had already malfunctioned in 2020, as described above;

       f.    Failing to provide for proper safety procedures should the Phase I BESS' fire suppression system fail;

g.      Failing to prevent catastrophic thermal runaway from consuming the Phase I BESS' building, escaping into the air in the form of toxic plumes of heavy metals and noxious gases;

h.      Failing to adequately warn Plaintiffs and the public of the risks associated with operating a facility full of dangerous NMC lithium-ion batteries; and

i.       Any other negligent acts or omissions proven at trial in this matter.

117.    As a direct result of Defendants' negligence, the fire and thermal runaway released significant and dangerous levels of toxic chemicals into Plaintiffs' homes and businesses, thus harming them.

118.    That harm was reasonably foreseeable.

119.    As a result, Plaintiffs have suffered damages including those already described above.

120.    Accordingly, Plaintiffs seek damages according to proof at trial, including, but not limited to, injury to real and personal property, injuries to their health and person, loss of income, and medical monitoring in the future.

### FOURTH CLAIM FOR RELIEF
### PRIVATE NUISANCE
### AGAINST ALL DEFENDANTS

121.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1-120 as if previously set forth herein.

122.    Plaintiffs are in lawful possession of their property.

123.    Defendants owned, maintained, operated, and controlled the Moss Landing BESS.

124.    Defendants' negligent, reckless, and/or intentional actions and inactions created conditions and/or permitted conditions to exist that were harmful to health, offensive to the senses, obstructed and/or entirely prevented free use of property, as to substantially interfere with the comfortable use and enjoyment of property by persons of ordinary sensibilities, and those conditions were a fire hazard to Plaintiffs' property.

125.    Defendants' conduct in acting or failing to act was intentional and unreasonable, or unintentional, but negligent or reckless.

126.    The condition created by Defendants' actions or inactions, including the smoke, ash, heavy metal deposit, particulate matter, and toxic gases/other chemicals emitted by the Vistra Fire substantially interfered with Plaintiffs' use and enjoyment of their property;

127.    An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct, and at no time did Plaintiffs consent to the Defendants' conduct.

128.    Plaintiffs were harmed by Defendants' conduct, actions, or inactions, and Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

129.    The seriousness of the harm sustained by Plaintiffs outweighs the public benefit of Defendants' conduct.

130.    Plaintiffs seek damages according to proof at trial, including but not limited to compensatory damages for injury to their property and interference with that property's use and enjoyment, and medical monitoring in the future.

## FIFTH CLAIM FOR RELIEF
### TRESPASS TO REAL PROPERTY AND CHATTEL
### AGAINST ALL DEFENDANTS

131.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1-130 as if previously set forth herein.

132.    Plaintiffs are in lawful possession of their property and real property.

133.    As a result of the conduct and activities of the Defendants, noxious and toxic substances from the fire and thermal runaway generated at the Phase I Vistra BESS have and continue to intrude upon and wrongfully cover and enter Plaintiffs' land and properties, thus interfering in Plaintiffs' interest, use and enjoyment in their land and properties, all without Plaintiff's permission.

134.    The contaminants emitted by Defendants from the Vistra Fire and thermal runaway event physically intruded onto land and properties owned by Plaintiffs. Those heavy metals and noxious gases and other dangerous substances physically damaged and injured Plaintiffs' land and properties. These intrusions would not have occurred, but for the actions of Defendants.

135.    The intrusion of the contaminants emitted by defendants have diminished the value and enjoyment of the Plaintiffs' land and real properties.

136.    Plaintiffs have suffered and continue to suffer from inconvenience, personal discomfort, and annoyance, including, but not limited to, sore throats, sinus irritation, breathing problems, headaches, tiredness, burning in the lungs, nausea, irritation of the skin, rashes, and other symptoms that they did not have before the January 16 Vistra Fire. Plaintiffs have sought medical treatment and diagnoses for these otherwise unexplainable symptoms.

137.    Plaintiffs have suffered emotional distress and anxiety, and their mental health has been harmed by the trespass' impact on the peaceful enjoyment of their real property.

138.    The trespass by Defendants was the actual and proximate cause of Plaintiffs' damages, including diminution of value of their properties, unlawful interference with their property rights such as loss of use, loss of enjoyment, loss of income, and discomfort, inconvenience, and worry. Defendants are liable to Plaintiffs for compensatory damages according to proof at trial, including lost profits. Defendants are also liable to Plaintiffs for medical monitoring in the future.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

a.    For compensatory damages in an amount to be proven at trial;

b.    For general damages in an amount to be proven at trial;

c.    For punitive damages to deter Defendants from future misconduct;

d.    For attorneys' fees and costs;

e.    For pre- and post- judgment interest as permitted by law;

f.    Medical monitoring;

g.    For such and other relief as the Court deems just and proper.

/./.

/./.

/./.

/./.

/./.

## VII.    <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated:  February 27, 2025          **COTCHETT, PITRE & McCARTHY, LLP**

By:     <u>*/s/ Joseph W. Cotchett*</u>
        JOSEPH W. COTCHETT
        DAVID G. HOLLENBERG
        BLAIR V. KITTLE
        CAROLINE YUEN

**LAW OFFICE OF MOLLY ERICKSON**

By:     <u>*/s/ Molly E. Erickson*</u>
        MOLLY E. ERICKSON

*Attorneys for Plaintiffs*